We're going to go to our last case, Boyd v. U.S. Postmaster General. Okay, Ms. Richardson. Yes, may it please the court? Yes. My name is Ashley Richardson. I'm here on behalf of Ms. Boyd. While we had five claims, we still have five claims pending from the action below. The two that I'd like to focus on today, provided the court doesn't have additional questions, are her claim of disability discrimination and the one of retaliation. They were disposed of in two different orders as the judge went back and asked that the parties essentially clarify the retaliation claim. But I'm going to start with disability. The primary issue on the disability claim— Can I have you talk a little bit louder? I'm having trouble hearing you. It's funny. No one has ever said that to me before. So on the issue of disability, the primary issue that we have is whether or not she was a qualified individual able to perform the duties of a postal carrier, which is someone who cases mail and then delivers it to your home, with or without a reasonable accommodation. In 2016, she was injured in essentially a workplace accident. She was involved in a car accident, which has left her with nerve damage, and she will occasionally have flare-ups that make it impossible essentially to turn her head from side to side. These flare-ups are— Where did your client ask for an accommodation? She actually just asked to be reinstated to her position, which sort of triggered the accommodation process. It's interesting. As I was reviewing for this, she doesn't ask for any of her job duties to be changed. She doesn't ask for a different position. She actually asked to be returned to her position and essentially allowed to use her PTO anytime she had one of these flare-ups, which, again, are brief and rare. And in the physician's notes that she provided, which could admittedly be worded better, it makes clear that she has these flare-ups and will only be unable to drive during one of these flare-ups. And after she was reinstated in November of 2017, prior to sort of the big acts in this case, she essentially worked for about a year without issue until she had a flare-up in May of 2018. But she drives a postal vehicle, right? Yes, well, that would have been if she was reinstated to that position. So how do you reconcile her ability to perform an essential duty, which is to drive the vehicle, with her doctor note that says that she was unable to drive a postal vehicle? Well, the doctor's note actually says that she's unable to drive the vehicle during this time, referencing back to the earlier portion of the statement that says when she's having a flare-up. So our position is that, just like any employee who may be out for a brief illness or, say, they have the flu, they're going to say, wake up in the morning, wow, I can't work today, I'm sick, and call in and use that PTO. That's essentially what she was asking for. And I believe there's reference when she was going through and discussing with the accommodations committee that she was 97% able to do her job. That was sort of her way of saying, look, I can do my job. There are just going to be some days that I can't do my job, and I'm just going to call in sick for those days. Whether or not she has leave, doesn't have leave, that's sort of a totally far-afield issue. But all she was asking for was to be returned to her position as a postal carrier, which she was able to do unless she was having this sort of major flare-up of nerve pain. So our position is that she is capable of performing the essential requirements of her job as a postal carrier with the occasional need to call in sick. Is there record evidence of the actual duration of the actual flare-ups? I don't think that we have anything specific from her physicians. They're very infrequent based on her testimony, and they only last a few days. And I believe she also testified that she can sort of feel when the nerve pain is about to flare up or get worse, as to why I'm not entirely sure. But she would essentially just call in sick as if she had the flu or a cold or some other ailment that would prevent her from coming to work that day. So when we look at the accommodation process, it's not necessarily that she even requested an accommodation. She just requested to be returned to work per her doctor's notice. But, I mean, I don't know how that gets you anywhere. A generic request to return to work is not a request for an accommodation. Well, the thing is, is I don't even know. I think the accommodation issue has sort of muddled all of this. It's really that she was prevented from being allowed to perform her job duties, period, because of her disability. Her request was to return to work. That's why there's a lengthy discussion about whether or not she fully participated in the accommodations process. I guess the voluntary calls from the accommodations committee, her position has always been, I can do my job, except when I have these flare-ups and I'll just call out sick. And that seems to be where the issue is. But I would argue that any employee at any job may potentially have to call in sick for a variety of reasons. So your position is that she did not need an accommodation. She just wanted to return to her previous job. That's, I mean, her testimony. Which she couldn't fully do because of the medical issues that she'd identified? Well, she could do the job, except under these very limited circumstances, when she would essentially be sick, for lack of a better description. And she requested repeatedly to be returned to that position. At which time she would need some sort of accommodation, right? Well, not necessarily. Like, we view it as more, she's fully able to do the job. If she wakes up in the morning. She had a lifting restriction, right? She did have a lifting restriction. So she's not fully able to do the job. It was, I believe it was 25 pounds. And that started immediately after the accident. And she returned to work in November. But she never, I mean, but where is the request for an accommodation for that? For the lifting restriction? I believe she just asked to occasionally flag somebody else down and say, hey, this package is heavy. Can somebody come help me move it? So you already said she didn't request an accommodation. So I guess she didn't ever, because my understanding is that the postal office had a substitute driver accommodation. You mean specific to her or just in general? You could have made that request for a substitute driver accommodation. Well, I think that's essentially what she said is, look, I'm able to do my job. On occasion, I'm going to have to call in sick. And it's just going to be whatever policy applies to carriers when they call in sick, which presumably would be a substitute driver so that the mail actually gets delivered. She didn't ask for any of her job duties to be changed, that she not drive a postal vehicle, but somehow be considered a carrier or that she not have to case her own mail, which is actually, I believe, what she's doing as part of her one and a half hours a day of light duty. So while there was a formal accommodation process was triggered because she has this medical issue, she wasn't asking for anything in her job to be changed. And with regards to the lifting restriction, it really was just as simple as, you know, 25 pounds. If it's over that, can somebody just please come help me? I don't know how a formal accommodation process can be triggered if you don't make an accommodation request. I think it was just during the discussion of her returning. So this was a worker's compensation injury, and I think that that led to the entire discussion. The premise, though, of a disability discrimination claim would be that your client is disabled, right? Correct. So I guess I'm having a little bit of trouble understanding your argument when you say she wants to return to work. Well, so the. She wants to return to work, but she claims that she's disabled. Well, she's disabled. She has this ongoing neck condition from the workplace injury. Right. And so she has to establish that she can do the work with a reasonable accommodation, but she has to request a reasonable accommodation, and she never did. It's with or without a reasonable accommodation is the way the law is written, and she's requested to be allowed to use her PTO when she's essentially physically ill and unable to come to work that day. So I think it's been classified as an accommodation or at least a request for some kind of consideration, and then there also is the 25-pound lifting restriction. But there's no specific request that she ever made for that. It's just during the course of discussion between workers' compensation and her supervisors who state that there was no light duty, which is not what she was asking for. She was just asking to return to her position and be reinstated. And our position is that, like any other employee who might potentially need leave, you know, she's disabled. She's requested that she be allowed to return to work and then just use her leave as necessary. Moving on to the retaliation claim, this one is incredibly fact-specific. And when we look at it, the way the court has written its order, the district court wrote its order below, is instead of looking at the retaliation claim and the actions that occurred as a whole, as one large picture, it was nitpicked and separated into these individual components such that you can't see the progression. What we have is from August of 2022 when she has her first encounter. This is about six to eight weeks after she takes some leave for one of these flare-ups. So this is August of 2019. She has this first encounter with Morrison, one of her supervisors, who places her on emergency placement, which is to be used for workplace violence, threats of safety issues, and intoxication of an employee. None of those factors are present. This happens again in October. She immediately files a grievance, and the next day, instead of conducting the fact-finding that he was supposed to, she's instead just put out and is essentially told to leave the building under threat of having the police called against her. In November, she's subjected to a 14-day suspension. She grieves all of this, and all of that is overturned. In December, she attempts to return to work because she still hasn't been returned to work at this point. She attempts to return for a union meeting or some kind of business because she's the union president. She is, again, threatened, told to leave the premises, or the police will be called. She's going through the entire process with workers' comps to be returned to her position. And in February, Morrison—so she's out this entire time. She comes back in. Morrison says, all I have for you is one and a half hours a day. Take it or leave it. And because she's a long-term postal employee, she takes it. She doesn't want to lose her position. So what the district court has done is said that's too far removed from when she filed her grievance, but she wasn't physically there to experience any additional acts of retaliation. So we have this time gap that's essentially disappeared if we smoosh together the two times that she was finally back at work. Same thing happens again in May. She's harassed about where she's parking, which she's been parking there since like 2000. It's never been an issue before—2010, excuse me. Never been an issue before. The supervisor that she filed an EEO complaint against in 2017, who was immediately moved to another location, returns. Like, that same day, the woman starts harassing her and screaming at her about her parking space such that our client essentially has a physical, anxious reaction to it. The supervisor, Ms. Cobb, demands that she bring a medical note the next day. She does. She's not allowed to return to work and ultimately has to grieve or amend one of her previous grievances to cover all of these interactions that happened in May. After that, she's immediately noticed that she's going to be removed from her position. And she's out of work until September when she goes through the entire grievance process and again has all of this discipline overturned. What the district court did was nitpick each one of these individual things, separate them out, and say that one is not related to the other. What we're asking this court to look at, pursuant to Reeves v. Worldwide, a couple of other letters, is the whole picture. These incidents can't be looked at in a vacuum. This is a clear cause-and-effect pattern of she takes an action and then reacts. Is it right to suggest, though, that, for example, the August 29th and October 22 incidents, including the threat to call the police, they predate your client's initial contact? They do. They can't possibly be retaliatory. We would argue that because of her prior EEO activity and the fact that she was the union president and known for assisting other employees with their union grievances, that that could show some sort of retaliatory effect. I will agree with you, though, because there's no other way to say it, that her first grievance related to this series of incidents came the day after, or two days after, the October 22nd one. That's the one we're here about. Well, we also have all of the additional actions, including one of the primary adverse actions, is that she has now been restricted to working just one and a half hours a day. The problem is, afterwards, there's no evidence that Morrison was aware. There isn't, but the timeline suggests that there's no direct evidence. I will give you that. But the timeline suggests otherwise, that this ongoing series of events was taken against her for retaliatory purposes. There's some overlap with the disability discrimination claim, for sure, when certain actions were taken and what reasons. But I see that I've sort of run out of time, so I'm going to save the rest of my time for rebuttal. Okay. Ms. Moyle. Good morning, Your Honors. May it please the Court, Marie Moyle on behalf of the Postal Service. And I'll start with the overarching issue that a district court noted, both at the hearing on summary judgment and in both of its order, in that it is still unclear what disputed facts Ms. Boyd is relying upon to create inference of intentional discrimination. And the court has phrased it at various times as identifying the malfeasance or the stinky stuff in the record. And, Your Honors, I would just submit that I do not see it here. The plaintiff has offered no evidence to show that any protected characteristics played a part in the way the ultimate employment decision was made. And I'd welcome an opportunity to address any particular facts. But if not, I'd like to move on and talk about summary judgment in general and how this case fits together within the trend of recent federal sector employment law. We understand summary judgment in general. Why don't we address what your opposing counsel has argued this morning, which is, should summary judgment have been granted against the disability discrimination claim and retaliation claim? Sure. So I would say, first of all, at the hearing on summary judgment, Ms. Boyd clearly limited her disability discrimination claim to a failure to accommodate claim. And that's at 65 of the transcript. And so the only question then becomes, with a reasonable accommodation, if she can perform the essential functions of her job. No one just disabutes that driving a mail truck is an essential function of her job. And so the reasonable accommodation would allow her to perform that duty. And, Judge Lagoa, as you mentioned, the record evidence, and I believe that sometimes states that she's unable to drive during a flare-up, but the Postal Service also has documentation at Exhibit 14-4 of the record that states she is unequivocally unable to drive a postal vehicle. Faced with that evidence, faced with the fact that she had four on-the-job accidents, there is no reasonable accommodation that would allow her to perform the essential functions. Did she request one? No. Isn't that the simplest answer to it? Yes, Your Honor. She says that she wants to return to her job, but, again, there is no reasonable accommodation that would allow her to do the functions of her position. Yeah, well, it's kind of a chicken-and-egg thing, it seems to me. If she says, I have a disability that can be reasonably accommodated, she nevertheless was required to request an accommodation, and I don't see where she ever did. Yes, Your Honor. Independently, there's no evidence in the record that she communicated with her supervisors that she could feel in advance that these flare-ups were coming. That would have been probably part of the reasonable accommodation committee process, which she declined to participate in. And the argument that, well, she could have just used PTO or sick leave, that is not a reasonable accommodation, and that was not what was requested here. Again, the mail still gets delivered, no matter if a carrier calls out sick or not. So, of course, there are substitute drivers, and the mail gets delivered every day. But she is not a qualified individual. So the rain, sleet, or snow, right? Yes. Moving on to the retaliation claim. Again, you'll see that the district court, both in the transcript at the hearing on summary judgment and in ordering supplemental briefing, is still unclear what the retaliatory actions are. And the district court focuses solely on causation because Ms. Boyd relies only on temporal proximity to alleged circumstantial evidence of retaliation. Again, Chief Judge Pryor, as you noted, certain adverse actions occurred before her initial EEO contact. Those in no way can be retaliatory. I mean, they predate the conduct. Second, the November and later October incidences that she alleges were retaliatory, there's no evidence in the record that Supervisor Morrison was aware of her projected EEO activity. It really is as simple as that. I believe his EEO – And he's the decision-maker. Yes, Your Honor. December, there's an allegation that she was, I guess, asked to leave another postal service station where she was perhaps going back on the workroom floor. But again, that's a different individual, different station. There's no evidence that that really would have been sufficiently adverse to affected terms and conditions of her employment. So then we move on to the May 2020 incidences. And again, even looking at the facts in the light most favorable to Ms. Boyd, it is clear that there were disputes about where she was parked. At some point, she told one of her management that she was off the clock and she didn't have to speak with him. But these incidences were in no way related to her February 2020 official EEO complaint. We're at the outer limit of the three months temporal proximity that you can infer retaliation. And there's just simply no evidence besides pure speculation to connect these these incidences. And again, I would just also note that those two May 2020 incidences, Supervisor Morrison was not even present at them. So generally, even if this other postal service management had knowledge over EEO activity, that mere knowledge without any other circumstantial evidence is not enough. Your Honor, I would I would submit that as I sort of. OK. All right. Well, I'll just yield the rest of my time unless there are any further questions. I don't hear any. OK. I ask that you affirm the district court in full. Thank you, Ms. Boyle. Ms. Richardson, you say four minutes. All right. Briefly, I feel like we've sort of exhausted on the disability issue as to whether or not she was disabled and requested an accommodation. So unless there are any additional questions following Ms. Boyle, I'm going to move on from that. As to the retaliation, retaliation was where I was headed. Yes, Your Honor. So my colleague across the aisle pointed out that we rely heavily on temporal temporal proximity. And that's because the temporal proximity essentially timeline here shows this ongoing action and reaction where our client, Ms. Boyd, takes some kind of action and is immediately met with some sort of hostile encounter, whether it's just getting yelled at by a supervisor or told to leave the premises, put out on suspension, threatened with. You still have to present evidence that the decision maker would have been aware, was aware of her protected activity. Well, I think by the time we get further on into this, for example, the November suspension, that knowledge was sort of established. I believe the only the issue is the evidence for that. I don't have anything specific to point to. But I believe that Mr. Morrison was part of that. That's the problem. I mean, it seems to me Morrison has to have there has to be some evidence that Morrison knows about this. Right. For you to be able to to establish that whatever Morrison did was retaliatory. Right. And it's not just, oh, what a coincidence that is. Well, and I definitely agree that coincidence is not going to get it. But there's a fair amount of circumstantial evidence here just based on the timing of all of these events. There's circumstantial evidence that he was aware of it. Yeah. And yes, your honor. And we've seen that. What's that? That would be the timeline. The fact that these events continue to happen one right after the other. I understand that that could be causation. Correct. That could be circumstantial evidence of that. I don't know how circumstantial evidence of knowledge. Well, I think we're getting to causation via that knowledge based on the circumstantial evidence. We cited several cases in our initial brief, pages 35 and 36, showing that one of the quotes that I find relevant here is that retaliation cases must often be proved with the cumulative weight of the circumstantial evidence. Since an employer who discriminates against its employees is unlikely to leave a well-marked trail, such as making a notation to the effect in the employee's personnel file. And while that certainly would have been handy in this case, it's certainly not the evidence that we are looking at right now. What we have is about an eight month period from August to the really to the following September when she's reinstated, where it seems like no matter what Ms. Boyd does at work, she is somehow getting put out from work. And that entire, that's why we've again returned back to the fact that we can't look at these incidents isolated in a vacuum like the district court did. We have to look at the bigger picture in order to see what was actually done to Ms. Boyd, essentially in an effort to get rid of her, up to and including just telling her she can only work one and a half hours a day, despite the fact that she's worked for the Postal Service since 1998. So on those grounds, we would ask that the court reverse the district court's opinion and find in Ms. Boyd's favor. Thank you. Okay. Thank you, Ms. Richardson. We understand your case and we are adjourned for the week.